# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

IVAN DOMINGUEZ,

    Petitioner,

v.

BRIAN E. WILLIAMS, et al.,

    Respondents.

Case No.: 2:12-cv-01609-APG-NJK

**Order**

Ivan Dominguez, a Nevada prisoner, filed a counseled petition for writ of habeas corpus under 28 U.S.C. § 2254. I deny Dominguez's habeas petition, deny him a certificate of appealability, and direct the Clerk of the Court to enter judgment accordingly.

## I.        BACKGROUND

Dominguez's convictions arise from events that occurred in Clark County, Nevada between approximately January 30 and February 9, 2007. ECF No. 10-8. Brian Ward, a bartender at the Flamingo Las Vegas Hotel and Casino, was a coworker of Mark Friedman. ECF No. 11-15 at 2-3. On the morning of January 30, 2007, Friedman planned to give Ward a ride home from work "about a little after 3:00 in the morning." *Id.* at 5. When Ward opened the door to get into Friedman's vehicle, Friedman was speaking on his cellular telephone and told the person on the other end of the telephone line that he would "be home in 30 minutes" and to "[s]top calling [him]." *Id.* at 8-9. It was later determined that Friedman was speaking to his girlfriend and business partner, Lilani Tomines. ECF No. 11-25 at 4. Friedman drove Ward home. ECF No. 11-15 at 10.

When Friedman arrived home, he "walked in through the garage that led into the house [and] was jumped by approximately five [unknown] subjects, four of them being Hispanic males. One was a female." ECF No. 11-14 at 36.  Friedman called 9-1-1 at 3:39 a.m., and when law enforcement arrived, Friedman was found "sitting in a chair on the phone with dispatch with a female next to him." *Id.* at 30; ECF No. 11-24 at 41.  That woman was later identified to be Tomines. ECF No. 11-14 at 38.  Friedman "appeared very injured" with "[b]lood all over him." *Id.* at 35.  Friedman told law enforcement that in addition to harming him physically, the attackers "robbed him, and they took his wallet and keys." *Id.* at 37.  Friedman's keys were later found "in one of the shirt pockets," but his wallet was never recovered. ECF No. 11-22 at 50; ECF No. 11-23 at 23.

After Friedman was transported to the hospital, Tomines was interviewed by law enforcement and reported that she arrived at Friedman's "residence at 1:00 in the morning[ and] went to bed in his room." *Id.* at 40.  Tomines then "woke up at 3:30 in the morning and noticed that [Friedman] wasn't there, so . . . she called him on his cell phone." *Id.*  When Friedman "answered the phone, [he] stated [that] he was already there inside the house, and she walked out, and that's when" he told her about being "jumped by five subjects." *Id.* at 40-41.  Tomines had not heard the attack. *Id.* at 50.  Tomines also reported that Friedman "told her that [the attackers] must have followed him home." *Id.* at 41.  Tomines was "fairly calm" and "[n]ot upset" during this conversation with law enforcement. *Id.* at 43.

Several discrepancies were detected in Tomines' law enforcement interview. ECF No. 11-24 at 44.  Contrary to her assertion that she called Friedman "around 3:30" and was told that Friedman was in the house bleeding, the 9-1-1 recording demonstrated that Tomines first encountered Friedman in the garage while he was speaking to the 9-1-1 operator. *Id.* at 44-45.  It

is noteworthy that Tomines later told Friedman's son that "[t]he commotion woke her up." ECF No. 11-18 at 31.  Tomines also suggested to law enforcement that Friedman had been followed home by the attackers, but when she tried to suggest that to Friedman while he was speaking with the 9-1-1 dispatcher, Friedman was adamant that the attackers "were in the house when [he] walked in." ECF No. 11-24 at 44-45.

There were no signs of forced entry or "sign[s] of a struggle or disturbance" within Friedman's residence. ECF No. 11-15 at 29; ECF No. 11-16 at 37, 42.  Rather, the only place in the house that was disturbed was the laundry room which had "a great deal of blood on the floor." ECF No. 11-16 at 42.  There was also "blood spatterings [sic] on . . . both the wall and the . . . appliances" in the laundry room. *Id.*  The bed in the master bedroom where Tomines alleged she had been sleeping did not appear to be have been slept in. *Id.* at 43.  Further, the front door of the residence was "slightly ajar" but the security door was locked, meaning that "whoever attacked [Friedman] was inside the house and . . . fled out the house through the [front door], and then somebody . . . lock[ed] that door when they left." ECF No. 11-24 at 35.

Friedman suffered "injuries to his scalp," "some injury to his neck," and "stab wounds [in] his abdomen and his flank area." ECF No. 11-19 at 43-44.  Friedman "was taken to surgery, and they repaired some of [his] wounds." *Id.* at 44-45.  However, following surgery Friedman vomited and aspirated while medical staff was attempting "to get [him] to come out of the anesthesia." *Id.* at 45.  Friedman never regained consciousness and died. *Id.* at 46.

An investigation later revealed that Tomines owned a car dealership and Friedman "provided money to purchase vehicles" and "receive[d] a salary and interest on the money that he lent to the business." ECF No. 11-18 at 24-25.  A search of Friedman's computer yielded a document showing money that Tomines owed him. ECF No. 11-22 at 18-19.  Law enforcement

also discovered that Tomines tried to fraudulently deposit two checks from Friedman's account into her business account. ECF No. 11-20 at 24, 28; ECF No. 11-25 at 17. The checks totaled $7,000. ECF No. 11-20 at 28. These checks were cashed by Tomines "the afternoon before [Friedman] was attacked and the afternoon of the day he was attacked." ECF No. 11-25 at 17. The checks were signed by someone other than Friedman. *Id.* at 19.

Tomines' cellular telephone records showed that she spoke to Demian Dominguez (hereinafter Demian), who was using his girlfriend's cellular telephone, several times on the evening of January 29, 2007 and the early morning hours of January 30, 2007. ECF No. 11-25 at 7-8, 14-15. And "cell-phone movement" records showed that Demian's cellular telephone moved from the location of his residence to Friedman's residence during those calls. *Id.* at 11-13. Further, records showed that Demian and Tomines spoke on the telephone 112 times in the 6-month window prior to the attack on Friedman. *Id.* at 15.

Law enforcement interviewed Demian, and he indicated that he knew Tomines because she was attempting to sell a car to his friend Saul. *Id.* at 31-32. Demian was not able to give law enforcement Saul's last name, date of birth, or phone number, but he claimed that Saul had his cellular telephone the night of the attack on Friedman. *Id.* at 33-34. Demian and Tomines were both arrested for Friedman's murder. *Id.* at 36-37.

Thereafter, law enforcement received "anonymous information" that implicated petitioner Ivan Dominguez, Demian's brother, in the attack. *Id.* at 37-38; ECF No. 13 at 30. Law enforcement apprehended Dominguez at the airport before he boarded a flight to Mexico and took his fingerprints. ECF No. 11-25 at 38, 42. While waiting for the fingerprint results, Dominguez was interviewed by law enforcement and initially denied being in Friedman's residence. ECF No. 13 at 42. Law enforcement then received confirmation that Dominguez's

fingerprints matched some fingerprints found in Friedman's laundry room. *Id.* at 26-27; *see also* ECF No. 11-15 at 45; ECF No. 11-16 at 16-17 (explaining that Dominguez's fingerprints were found "on the east utility wall" and on "the interior side of [the] door from [the] garage into [the] house").  At this point in the interview, Dominguez "acknowledge[d] that maybe he entered the laundry room." ECF No. 13 at 26-27.  Dominguez then indicated that he "really didn't participate" and then that he "punched [Friedman] one time." *Id.* at 42.

Following a jury trial, Dominguez was found guilty of conspiracy to commit murder, conspiracy to commit a crime, and first-degree murder with the use of a deadly weapon. ECF No. 13-4.  Dominguez was sentenced to 24 to 72 months for the conspiracy to commit murder conviction, 12 months for the conspiracy to commit a crime conviction, and life with parole eligibility after 20 years on the first-degree murder conviction, plus a consecutive term of life with parole eligibility after 20 years for the deadly weapon enhancement. ECF No. 13-8. Dominguez appealed, and the Supreme Court of Nevada affirmed on December 10, 2010. ECF No. 13-18.  Remittitur issued on January 4, 2011. ECF No. 13-19.

Dominguez filed a pro se state habeas petition on October 31, 2011. ECF No. 13-24.  The state district court denied the petition on January 27, 2012. ECF No. 12.  Dominguez appealed, and the Supreme Court of Nevada affirmed on July 25, 2012. ECF No. 12-18.  Remittitur issued on August 20, 2012. ECF No. 12-19.

Dominguez's federal habeas petition was filed on November 19, 2012. ECF No. 6.  The respondents moved to dismiss the petition on January 3, 2013. ECF No. 8.  Dominguez moved for the appointment of counsel on March 26, 2013, and Judge Du granted that request on April 8, 2013. ECF Nos. 18, 21.  Judge Du also denied the respondents' motion to dismiss without

1  prejudice to the filing of a new or renewed motion to dismiss once an amended petition was

2  filed. ECF No. 21.  On April 30, 2013, this case was reassigned to me. ECF No. 24.

3        Dominguez filed a counseled first amended petition on November 14, 2013. ECF No. 31.

4  The respondents moved to dismiss the amended petition on December 16, 2013, and Dominguez

5  moved for an order staying and holding these proceedings in abeyance on June 27, 2014. ECF

6  Nos. 34, 45.  I granted the motion to dismiss in part. ECF No. 48.  Specifically, I dismissed

7  Grounds 2, 3, and 14 as untimely; determined that Grounds 11, 12, 13, 15, and 16 were

8  unexhausted; and determined that Grounds 5 - 10 were unexhausted in part. *Id.* at 8.  On April

9  13, 2015, I granted Dominguez's motion to stay and hold these proceedings in abeyance, and I

10  ordered the clerk of court to administratively close this action. ECF No. 61.

11        Dominguez filed a counseled second state habeas petition on October 12, 2015. ECF No.

12  75-5.  The state district court denied the petition on June 21, 2016. ECF No. 75-20.  Dominguez

13  appealed, and the Supreme Court of Nevada affirmed on July 12, 2017, determining that

14  Dominguez's petition was untimely and successive. ECF No. 75-36.  Remittitur issued on

15  August 9, 2017. ECF No. 75-37.

16        Dominguez moved to reopen this action on August 14, 2017. ECF No. 64.  I granted the

17  motion on September 5, 2017. ECF No. 66.  The respondents renewed their motion to dismiss

18  Dominguez's amended petition on December 22, 2017. ECF No. 74.  I granted the motion in

19  part. ECF No. 88.  Specifically, I dismissed Grounds 12 and 16, and I deferred consideration of

20  whether Dominguez could demonstrate cause and prejudice to overcome the procedural default

21  of Grounds 5 - 11, 13, and 15. *Id.* at 3.  The respondents answered the remaining claims in the

22  amended petition on December 6, 2018. ECF No. 91.  Dominguez replied on June 6, 2019. ECF

23  No. 100.

In his remaining grounds for relief, Dominguez alleges the following violations of his federal constitutional rights:

> 1.   There was insufficient evidence to support his conviction because the victim's medical intervention was the proximate cause of his death.
> 4.   His trial counsel failed to file a pre-trial motion to dismiss or a pre-trial habeas petition.
> 5.   His trial counsel failed to object to prejudicial jury instructions.
> 6.   His trial counsel failed to challenge whether there was sufficient evidence that he used a deadly weapon.
> 7.   His trial counsel failed to challenge whether there was sufficient evidence showing that he participated in the crime.
> 8.   His trial counsel failed to allow him to testify and to hire a forensic latent print expert.
> 9.   His trial counsel failed to hire a forensic pathologist.
> 10.  There were cumulative errors.
> 11.  His trial counsel failed to adequately argue a motion to suppress evidence, to conduct a pretrial investigation of an alternative suspect, to limit the use of his co-defendants' statements to eliminate any references to him, and to object to his incriminating statements being admitted into evidence.
> 13.  His trial counsel failed to investigate the State's witnesses.
> 15.  His trial counsel failed to move to suppress his confession.

ECF No. 31.

## II.   STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act (AEDPA) sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

/ / / /

1  ## III.     DISCUSSION

2  ### A.     Ground 1

3  In Ground 1, Dominguez alleges there was insufficient evidence to support his murder

4  conviction because the victim's stab wounds were not the actual and proximate cause of his

5  death. ECF No. 31 at 16.  Rather, the mechanism of the victim's death was the aspiration of his

6  vomit, and the direct cause of that aspiration was the exploratory surgery. *Id.* at 21.  In affirming

7  Dominguez's judgment of conviction, the Supreme Court of Nevada held:

8  > Dominguez argues that his murder conviction must be reversed because the victim
   > died of intervening medical error, not of the stab wounds that placed him in the

9  > hospital.  We reject this contention.  The victim reported in his 9-1-1 call that he
   > had been attacked by a group of individuals who were waiting for him inside when

10 > he returned home.  Dominguez, whose fingerprint was found at the scene, admitted
   > to being part of that group and to hitting the victim, though he asserted that another

11 > individual in the group stabbed him.  A medical examiner testified that though the
   > victim died following exploratory surgery, his cause and manner of death were

12 > homicide due to multiple stab wounds.  We conclude that because these injuries
   > were a "substantial factor" in the victim's death, Dominguez cannot escape liability

13 > for murder. *Lay v. State*, 110 Nev. 1189, 1192-93, 886 P.2d 448, 450 (1994).

14 ECF No. 13-18 at 2-3.  The Supreme Court of Nevada's rejection of Dominguez's claim was

15 neither contrary to nor an unreasonable application of clearly established law as determined by

16 the Supreme Court of the United States.

17 "[T]he Due Process Clause protects the accused against conviction except upon proof

18 beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

19 charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A federal habeas petitioner "faces a heavy

20 burden when challenging the sufficiency of the evidence used to obtain a state conviction on

21 federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  On direct

22 review of a sufficiency of the evidence claim, a state court must determine whether "any rational

23 trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

9

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The evidence is to be viewed "in the light most favorable to the prosecution." *See id.*  Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

### 1.    Relevant Evidence

Dr. Gary Telgenhoff, a forensic pathologist at the Clark County Coroner's Office, testified that he reviewed the autopsy of Friedman, which was performed by Dr. Piotr Kubiczek, as well as Friedman's medical records. ECF No. 11-19 at 38, 41-43.  Friedman suffered from "injuries to his scalp," "some injury to his neck," and "stab wounds [in] his abdomen and his flank area." *Id.* at 43-44.  Following the attack, Friedman "was taken to surgery, and they repaired some of [his] wounds." *Id.* at 44-45.  Doctors then "did [an] exploratory laparotomy [which] showed that there was no serious internal injury from the stab wounds even though they went in a few inches deep." *Id.* at 45.  "However, during the surgical procedure or shortly thereafter when they[ were] removing tubes and things like that from [Friedman] . . . trying . . . to get [him] to come out of the anesthesia," Friedman "began to throw up or vomit." *Id.*  While "[t]hey were suctioning things from [Friedman's] airway, . . . he went downhill clinically" and never regained consciousness. *Id.* at 45-46.

Dr. Kubiczek concluded that Friedman's manner of death was homicide and his cause of death was "multiple sharp-force injuries due to assault." ECF No. 11-20 at 13.  Dr. Telgenhoff testified that although Friedman's injuries "were not life threatening" and "[h]e died of the complications in the recovery room," Friedman's cause of death was not "the result of complications sustained in the recovery room." *Id.* at 14.  Rather, Friedman's wounds required medical treatment and he "ultimately died from complications associated with the medical

treatment for those stab wounds." *Id.* at 17.  Dr. Telgenhoff explained that "[c]ause of death is

the underlying situation that . . . brings about the demise," while the mechanism of death "is the

final moments or the actual physiology that's going on with the individual." *Id.* at 19.  Dr.

Telgenhoff gave the following example, "[i]f a person is shot in the head, . . . one could argue

they didn't die from the gunshot to the head, they died from all the bleeding. . . . [T]he

underlying cause [of death in this example would be] the gunshot wound" even though "the

bleeding killed him." *Id.* at 19.  Here, Friedman's mechanism of death was "his inhalation of . . .

vomit." *Id.* at 15.

### 2.       Relevant Statues and Legal Theories

Dominguez only disputes the sufficiency of the evidence related to his murder

conviction. *See* ECF No. 31 at 16.  Sufficiency of the evidence claims are judged by the elements

defined by state law. *Jackson*, 443 U.S. at 324 n.16.  Nevada law defines murder as "the

unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied."

Nev. Rev. Stat. § 200.010(1).  And, as it relates to the facts of this case, first-degree murder is

murder "which is (a) Perpetrated by means of poison, lying in wait or torture, or by any other

kind of willful, deliberate and premeditated killing" or "(b) Committed in the perpetration or

attempted perpetration of . . . robbery, burglary, [or] invasion of the home." Nev. Rev. Stat.

§ 200.030(1)(a), (b).  The jury was instructed that they could find Dominguez guilty of murder

under one of four theories of liability: (1) that Dominguez directly committed the crime, (2) that

Dominguez aided and abetted Tomines and Demian in the commission of the crime, (3) pursuant

to the felony murder rule, or (4) pursuant to a conspiracy to commit murder. *See* ECF No. 13-2 at

6-7.  Nevada law does not require "that the jury . . . unanimously agree on a single theory of . . .

murder." *Crawford v. State*, 121 Nev. 744, 750, 121 P.3d 582, 586 (2005).

### 3.      Sufficiency of the Evidence

Dominguez challenges the sufficiency of the evidence of his murder conviction based on causation. *See* ECF No. 31 at 16.  The Supreme Court of Nevada has explained that "a criminal defendant can only be exculpated where, due to a superseding cause, he was in no way the proximate cause of the result" and "[a]ny intervening cause must, effectively, break the chain of causation." *Etcheverry v. State*, 107 Nev. 782, 785, 821 P.2d 350, 351 (1991) (internal quotation marks and citations omitted).  "Thus, an intervening cause must be a superseding cause, or the sole cause of the injury in order to completely excuse the prior act." *Id.*  "A defendant will not be relieved of criminal liability for murder when his action was a substantial factor in bringing about the death of the victim." *Lay v. State*, 110 Nev. 1189, 1192, 886 P.2d 448, 450 (1994).  In *Lay*, the court held that "[e]ven if the direct cause of [the victim's] death had been negligent medical care, the gunshot wound that necessitated the medical care was a substantial factor in bringing about [the victim's] death." *Id.*

Here, Dr. Telgenhoff testified that although Friedman's mechanism of death was his aspiration of vomit following his surgery, his cause of death was the stab wounds he received during the attack because those stab wounds necessitated the medical treatment that led to his aspiration. ECF No. 11-20 at 13-14, 17.  Thus, similar to the facts in *Lay*, the stab wounds that caused the need for surgery were a substantial factor in bringing about his death. *Lay*, 110 Nev. at 1192, 886 P.2d at 450.  Viewing this causation evidence "in the light most favorable to the prosecution" (*Jackson*, 443 U.S. at 319), a rational trier of fact could have found beyond a reasonable doubt that Dominguez—either directly, through aiding and abetting, through a conspiracy, or pursuant to the felony murder rule—murdered Friedman.  As such, the Supreme Court of Nevada's ruling that there was sufficient evidence to convict Dominguez of murder was

1  reasonable. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; *Jackson*, 443 U.S. at 319;

2  Nev. Rev. Stat. § 200.030.  I deny Dominguez federal habeas relief for Ground 1.

3  **B.    Ground 4**

4      In Ground 4, Dominguez alleges that his trial counsel failed to file a pre-trial motion to

5  dismiss or a pre-trial habeas petition regarding the defective indictment. ECF No. 31 at 24-25.

6  Dominguez bases this ground on the paucity of evidence presented to the grand jury. ECF No.

7  100 at 11.  He also argues that the indictment was insufficient because it contained the date of

8  the attack on Friedman rather than the day of his death. *Id.*  In its order affirming the state district

9  court's denial of Dominguez's first state habeas petition, the Supreme Court of Nevada held:

> [A]ppellant claimed that his trial counsel failed to file a pretrial motion to dismiss
> or pretrial petition for a writ of habeas corpus challenging the sufficiency of the
> evidence and alleged errors in the charging document.  Appellant failed to
> demonstrate that his trial counsel's performance was deficient or that he was
> prejudiced.  The grand jury does not determine the guilt or innocence of the
> defendant but rather determines whether probable cause has been presented that a
> crime was committed and that the defendant committee the crime, and probable
> cause may be based on slight or marginal evidence. NRS 172.155(1); *Sheriff v.
> Burcham*, 124 Nev. 1247, 1257-58, 198 P.3d 326, 332-33 (2008).  Appellant failed
> to demonstrate that the State did not meet its burden of establishing probable cause
> to bind appellant over for trial.  Further, appellant failed to demonstrate that the
> charging document did not set forth a plain, concise, and definite written statement
> of the essential facts constituting the offenses charged. NRS 173.075(1).  Therefore,
> we conclude that the district court did not err in denying this claim.

18  ECF No. 12-18 at 3.  The Supreme Court of Nevada's rejection of Dominguez's ineffective-

19  assistance-of-counsel claim was neither contrary to nor an unreasonable application of clearly

20  established law as determined by the Supreme Court of the United States.

21      In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of

22  ineffective assistance of counsel, requiring the petitioner to demonstrate (1) that the attorney's

23  "representation fell below an objective standard of reasonableness," and (2) that the attorney's

1    deficient performance prejudiced the defendant such that "there is a reasonable probability that,

2    but for counsel's unprofessional errors, the result of the proceeding would have been different."

3    *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  A court considering a claim of

4    ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls

5    within the wide range of reasonable professional assistance." *Id.* at 689.  The petitioner's burden

6    is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel'

7    guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  Additionally, to establish

8    prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had

9    some conceivable effect on the outcome of the proceeding." *Id.* at 693.  Rather, the errors must

10   be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at

11   687.

12          Where a state district court previously adjudicated the claim of ineffective assistance of

13   counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult.

14   *See Harrington*, 562 U.S. at 104–05.  In *Harrington*, the Supreme Court of the United States

15   clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in

16   tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th

17   Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's

18   *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards

19   apply; hence, the Supreme Court's description of the standard as doubly deferential.").  "When

20   § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is

21   whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential

22   standard." *Harrington*, 562 U.S. at 105.

23

1    At the grand jury proceedings in this case, Officer Garth Findley testified that he

2    observed "various stab wounds around [Friedman's] mid section" when he arrived at Friedman's

3    residence. ECF No. 10-5 at 12.  Friedman told Officer Findley that "[o]nce he entered the door

4    that led into [his] residence, he was walking through the hallway [when] he was jumped by six

5    individuals." *Id.* at 13-14.  Friedman also told Officer Findley that the attackers "took his keys

6    and wallet." *Id.* at 14.  Detective Dolphis Boucher testified that Friedman's wallet was never

7    located and that Friedman "died about nine days" after the attack. ECF No. 10-6 at 14; ECF No.

8    10-5 at 38.  Dr. Jacqueline Benjamin, a medical examiner with the Clark County Coroner's

9    Office, testified that Friedman's "cause of death was multiple sharp force injuries due to assault"

10   and his manner of death was homicide. ECF No. 10-6 at 11-12.  Dr. Benjamin explained that

11   "but for the attack that took place on [Friedman], he wouldn't have been in the hospital and he

12   wouldn't have died in that manner." *Id.* at 11.

13       Detective Boucher contacted Dominguez at the airport after "receiv[ing] information that

14   he was trying to flee the jurisdiction and that he was involved in the murder of Mark Friedman."

15   ECF No. 10-6 at 15.  Dominguez told Detective Boucher that he went with Demian to

16   Friedman's house, but Dominguez stayed in the car. *Id.* at 17.  Fred Boyd, a forensic scientist

17   specializing in latent print identification, testified that Dominguez's fingerprints matched

18   fingerprints found at the crime scene. ECF No. 10-5 at 32-33.  When Dominguez was confronted

19   with this fact, Dominguez told Detective Boucher "that he was in there, but that he only went

20   there to help his brother and he indicated that he had punched the man one time." ECF No. 10-6

21   at 19.

22       The grand jury returned a true bill "charging the crimes of conspiracy to commit robbery,

23   conspiracy to commit murder, conspiracy to commit a crime, burglary, robbery with use of a

deadly weapon, [and] murder with use of a death weapon." ECF No. 10-6 at 22.  The formal indictment alleged that Dominguez committed these crimes "on or between January 30, 2007, and February 9, 2007." ECF No. 10-8 at 2.

The Supreme Court of Nevada reasonably determined that Dominguez failed to demonstrate that his trial counsel was deficient for not challenging the alleged errors in the indictment or the sufficiency of the evidence presented to the grand jury. *Strickland*, 466 U.S. at 688.  First, the formal indictment was not insufficient for failing to contain the day of Friedman's death because it appropriately noted that Dominguez committed the crimes "on or between January 30, 2007, and February 9, 2007." ECF No. 10-8 at 2.  Thus, as the Supreme Court of Nevada reasonably concluded, the indictment complied with Nevada law, which requires an indictment to "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Nev. Rev. Stat. § 173.075(1).

Second, regarding the sufficiency of the evidence presented to the grandy jury, Nevada law provides that a "defendant may object to the sufficiency of the evidence to sustain the indictment only by application for a writ of habeas corpus." Nev. Rev. Stat. § 172.155(2).  The standard for finding an indictment is outlined in Nev. Rev. Stat. § 172.155(1): "[t]he grand jury ought to find an indictment when all the evidence before them, taken together, establishes probable cause to believe that an offense has been committed and that the defendant has committed it." *See also Sheriff, Clark County v. Burcham*, 124 Nev. 1247, 1257, 198 P.3d 326, 332-333 (2008) ("The grand jury does not determine guilt or innocence, but instead decides whether probable cause supports the indictment.").  Here, the Supreme Court of Nevada reasonably concluded that Dominguez failed to demonstrate that the State did not meet this standard.  Indeed, the State presented evidence that Friedman was attacked and robbed after

1   entering his residence, that Friedman died as a result of the injuries he sustained in the attack,

2   that Dominguez's fingerprints were found inside Friedman's residence, and that Dominguez

3   admitted he punched the victim. *See* ECF Nos. 10-5, 10-6.  This evidence met the probable cause

4   standard required by Nevada law. *See Burcham*, 124 Nev. at 1258, 198 P.3d at 333 (explaining

5   that "[t]he finding of probable cause may be based on slight, even marginal evidence" and that

6   the State is only required "to present enough evidence to support a reasonable inference that the

7   accused committed the offense" (internal quotation marks and alteration omitted)).

8          A pre-trial motion to dismiss or a pre-trial habeas petition would have been meritless

9   here.  Thus, the Supreme Court of Nevada reasonably denied Dominguez's ineffective-

10  assistance-of-counsel claim. *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) ("The

11  failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.").

12  As such, I deny Dominguez federal habeas relief for Ground 4.

13         **C.      Grounds 5, 6, 7, 8, and 9**

14         The respondents previously asserted that Grounds 5 - 9 were unexhausted. ECF No. 34 at

15  11.  The respondents contended that Dominguez incorporated all relevant facts and allegations of

16  the other grounds of his amended federal petition into these grounds, but because his first state

17  habeas petition did not contain all the grounds contained in his amended federal petition,

18  Dominguez improperly incorporated new facts and allegations, rendering these claims

19  unexhausted. *Id.*  I agreed. ECF No. 48 at 8.  After staying this action and allowing Dominguez

20  to return to state court, the Nevada Court of Appeals ultimately held that Dominguez's second

21  state habeas petition was untimely and successive. *See* ECF No. 88 at 1.  Thus, the respondents

22  argued that Grounds 5 - 9 were procedurally barred. ECF No. 74 at 6.  Dominguez responded

23  that any procedural default should be excused because he did not have counsel during his first

1   state habeas petition, relying on *Martinez v. Ryan*, 566 U.S. 1 (2012). ECF No. 88 at 1-2.  I

2   deferred resolution of this issue. *Id.* at 2.

3     The respondents now argue that "[t]o the extent the incorporated facts fundamentally

4   alter the claims, Grounds [5, 6, 7, 8, and 9] are procedurally barred." ECF No. 91 at 13.  "A

5   claim has not been fairly presented in state court if new factual allegations either 'fundamentally

6   alter the legal claim already considered by the state courts,' or 'place the case in a significantly

7   different and stronger evidentiary posture than it was when the state courts considered it.'"

8   *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (internal citation omitted) (quoting

9   *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) and *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir.

10  1988)).  Although Dominguez may have incorporated all relevant facts and allegations of the

11  other grounds of his amended federal petition into Grounds 5 - 9, I cannot conclude that these

12  "new factual allegations" fundamentally altered those grounds into new claims as compared to

13  their presentation in Dominguez's first state habeas action.  Therefore, Grounds 5 - 9 are not

14  subject to the procedural default doctrine and will be reviewed under 28 U.S.C. § 2254(d). *See*

15  *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011).

16    **1. Ground 5**

17    In Ground 5, Dominguez alleges that his trial counsel failed to object to four prejudicial

18  jury instructions. ECF No. 31 at 26.  Dominguez asserts that Jury Instruction No. 23 "illegally

19  erase[d] the line between first- and second-degree murder," that Jury Instruction No. 25 was

20  ambiguous when read in conjunction with Jury Instruction No. 23, that Jury Instruction No. 39

21  allowed the jury to convict him based upon emotional feelings and shifted the burden of proof,

22  and that Jury Instruction No. 33 was legally inadequate. *Id.* at 27-29.

23  / / / /

### a.    Jury Instruction Nos. 23 and 25

Dominguez takes issue with the following italicized portion of Jury Instruction No. 23:

> Premeditation need not be for a day, an hour, or even a minute. *It may be as instantaneous as successive thoughts of the mind.* For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

ECF No. 13-2 at 27 (emphasis added). Dominguez also takes issue with Jury Instruction No. 25, which provided in relevant part:

> [A] killing which is committed in the perpetration of a Burglary and/or Robbery or Attempted Burglary and/or Robbery is deemed to be Murder in the First Degree, whether the killing was intentional, unintentional, accidental or the product of provocation. This is called the Felony-Murder Rule. The intent to perpetrate or attempt to perpetrate Burglary and/or Robbery must be proven beyond a reasonable doubt. In order for the Felony-Murder Rule to apply under a robbery theory, the intent to take the property must be formed prior to the act constituting the killing.

*Id.* at 29.

In affirming the district court's denial of Dominguez's first state habeas petition, the Supreme Court of Nevada held:

> [A]ppellant claimed that his trial counsel failed to object to jury instructions 23 and 25, defining first-degree murder and felony murder. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Appellant failed to demonstrate that the jury instructions set forth incorrect statements of law. *See Rose v. State*, 127 Nev. ___, ___, 255 P.3d 291, 295 (2011) ("The felony-murder rule makes a killing committed in the course of certain felonies murder, without requiring the State to present additional evidence as to the defendant's mental state."); *Byford v. State*, 116 Nev. 215, 236-37, 994 P.2d 700, 714-15 (2000) (setting forth the premeditation and deliberation jury instructions, which recognizes that premeditation may be as instantaneous as successive thoughts of the mind). Appellant failed to demonstrate that there was a reasonable probability of a different outcome had his trial counsel objected to these jury instructions. Therefore, we conclude that the district court did not err in denying this claim.

ECF No. 12-18 at 3-4.  This ruling was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States.

First, the relevant portion of Jury Instruction No. 23 is identical to the model first-degree murder instruction on willful, deliberate, and premeditated killing outlined by the Supreme Court of Nevada in *Byford v. State*, 116 Nev. 215, 237, 994 P.2d 700, 714 (2000).  Second, Jury Instruction No. 23 on willful, deliberate, and premeditated first-degree murder and Jury Instruction No. 25 on first-degree felony murder are not ambiguous when read in conjunction as Dominguez asserts; rather, they properly discuss two valid theories of first-degree murder. *See* Nev. Rev. Stat. § 200.030(1)(a-b) (outlining willful, deliberate, and premeditated killing and felony murder as theories of first-degree murder); *see also Holmes v. State*, 114 Nev. 1357, 1364 972 P.2d 337, 342 (1998) (reiterating that "premeditation and felony-murder are alternate theories upon which the State may rely in its attempt to establish the mens rea element of the crime of first degree murder").  Because Jury Instruction No. 23 is a correct statement of Nevada law and Jury Instruction Nos. 23 and 25 are not ambiguous when read together, the Supreme Court of Nevada reasonably concluded that Dominguez's trial counsel was not deficient for not objecting to these instructions. *Strickland*, 466 U.S. at 688.

### b.      Jury Instruction No. 39

Jury Instruction No. 39 provided:

The Defendant is presumed innocent until the contrary is proved.  This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.

A reasonable doubt is one based on reason.  It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction

of the truth of the charge, there is not a reasonable doubt.  Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

ECF No. 13-2 at 43.

In affirming the district court's denial of Dominguez's first state habeas petition, the Supreme Court of Nevada held:

[A]ppellant claimed that trial counsel failed to object to jury instruction 39, which defined reasonable doubt.  Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced.  Jury instruction 39 contained the statutory definition of reasonable doubt as set forth in NRS 175.211, and NRS 175.211 has been previously determined to be constitutional. *Lord v. State*, 107 Nev. 28, 40, 806 P.2d 548, 556 (1991).  Therefore, we conclude that the district court did not err in denying this claim.

ECF No. 12-18 at 4.  This ruling was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States.

"[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (internal citation omitted) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).  In assessing the constitutionality of a jury instruction, it must be determined "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard."[1] *Id.* at 6.

---

[1] As was explained in connection with Ground 1, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364.

The Ninth Circuit evaluated a nearly identical reasonable doubt instruction in *Ramirez v. Hatcher*.[2] 136 F.3d 1209, 1210-11 (9th Cir. 1998).  The court held that "[a]lthough [it did] not herald the Nevada instruction as exemplary, [it] conclude[d] that the overall charge left the jury with an accurate impression of the government's heavy burden of proving guilt beyond a reasonable doubt" such that "the jury charge satisfied the requirements of due process." *Id.* at 1215; *see also Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir. 2000) (holding that the reasonable doubt jury instruction was identical to the one in *Ramirez*, so "[t]he law of this circuit thus forecloses Nevius's claim that his reasonable doubt instruction was unconstitutional").

Jury Instruction No. 39 also complied with Nevada law. *See* Nev. Rev. Stat. § 175.211 (defining reasonable double and mandating that "[n]o other definition of reasonable doubt may be given by the court to juries in criminal actions in this State"); *see also Buchanan v. State*, 119 Nev. 201, 221, 69 P.3d 694, 708 (2003) (explaining that the Supreme Court of Nevada "has repeatedly reaffirmed the constitutionality of Nevada's reasonable doubt instruction" codified in Nev. Rev. Stat. § 175.211).  Because the language in Jury Instruction No. 39 has been deemed constitutional by the Ninth Circuit and because it complied with Nevada law, the

---

[2] The only difference between the reasonable doubt jury instruction provided in Dominguez's trial and the reasonable doubt jury instruction provided in *Ramirez* was the omission of the word "substantial." *Compare* ECF No. 13-2 at 43 (". . . Doubt to be reasonable, must be actual, not mere possibility or speculation."), *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210-11 (9th Cir. 1998) (". . . Doubt to be reasonable must be actual *and substantial*, not mere possibility or speculation.") (emphasis added).  However, because "the use of the term 'substantial' to describe reasonable doubt has been disfavored," *Ramirez*, 136 F.3d at 1212, the reasonable doubt instruction provided in Dominguez's trial was even more acceptable than the reasonable doubt instruction in *Ramirez*.

1    Supreme Court of Nevada reasonably concluded that Dominguez's trial counsel was not

2    deficient for not objecting to the instruction. *Strickland*, 466 U.S. at 688.

3                              **c.      Jury Instruction No. 33**

4          Jury Instruction No. 33 provided:

5          If more than one person commits a crime, and one of them uses a deadly weapon
           in the commission of that crime, each may be convicted of using the deadly weapon
6          even though he did not personally himself/herself use the weapon. An unarmed
           offender "uses" a deadly weapon when the unarmed offender is liable for the
7          offense, another person liable to the offense is armed with and uses a deadly weapon
           in the commission of the offense, and the unarmed offender had knowledge of the
8          use of the deadly weapon.

9    ECF No. 13-2 at 37.

10         In affirming the district court's denial of Dominguez's first state habeas petition, the

11   Supreme Court of Nevada held:

12         [A]ppellant claimed that trial counsel failed to object to jury instruction 33, setting
           forth the deadly weapon enhancement instruction for the unarmed participant.
13         Appellant failed to demonstrate that his trial counsel's performance was deficient
           or that he was prejudiced.  Appellant failed to demonstrate that jury instruction 33
14         did not adequately define an unarmed participant's liability for the use of a deadly
           weapon by another during the commission of an offense, as exercise of control by
15         the unarmed participant is not required. *Nelson v. State*, 123 Nev. 534, 549-50, 170
           P.3d 517, 528 (2007).  Appellant failed to demonstrate that there was a reasonable
16         probability of a different outcome had his trial counsel objected to this jury
           instruction.  Therefore, we conclude that the district court did not err in denying
17         this claim.

18   ECF No. 12-18 at 4-5.  This ruling was neither contrary to nor an unreasonable application of

19   clearly established law as determined by the Supreme Court of the United States.

20         The Supreme Court of Nevada has "conclude[d] that an unarmed offender 'uses' a deadly

21   weapon . . . when the unarmed offender is liable as a principal for the offense" or when "another

22   principal to the offense is armed with and uses a deadly weapon in the commission of the

23   offense, and the unarmed offender had knowledge of the use of a deadly weapon." *Brooks v.*

                                              23

*State*, 124 Nev. 203, 210, 180 P.3d 657, 661 (2008); *see also Nelson v. State*, 123 Nev. 534, 549-50, 170 P.3d 517, 528 (2007) (determining that "an unarmed defendant with knowledge of the firearm who benefits from its use may be held liable for aiding and abetting the armed defendant" and "an unarmed defendant who benefits from the firearm even though he does not have the ability to exercise control over the firearm may be held criminally responsible for the actions of the armed defendant"). As Jury Instruction No. 33 mirrors the holding of *Brooks*, it is an accurate reflection of Nevada law. The Supreme Court of Nevada reasonably concluded that Dominguez's trial counsel was not deficient for not objecting to the instruction. *Strickland*, 466 U.S. at 688.

I deny Dominguez federal habeas relief for Ground 5.

## 2.      Ground 6

In Ground 6, Dominguez alleges that his trial counsel was deficient for failing to challenge the insufficiency of the evidence regarding his "use" of a deadly weapon. ECF No. 31 at 29. Dominguez elaborates that there was no evidence to prove that he used, had knowledge of, or exercised dominion or control over the deadly weapon. *Id.* at 30. In its affirmation of the district court's denial of Dominguez's state habeas petition, the Supreme Court of Nevada held:

> [A]ppellant claimed that trial counsel failed to object that there was insufficient evidence of use of a deadly weapon. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. The cause and manner of the victim's death was homicide due to multiple stab wounds. Appellant failed to demonstrate that there was a reasonable probability of a different outcome had trial counsel raised an objection to the sufficiency of the evidence relating to the deadly weapon. Therefore, we conclude that the district court did not err in denying this claim.

ECF No. 12-18 at 5. This ruling was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States.

1    The evidence presented at Dominguez's trial demonstrated that Friedman suffered from

2  "stab wounds [in] his abdomen and his flank area" and that these wounds "tend[ed] to reflect that

3  a knife of some type was used." ECF No. 11-19 at 44; ECF No. 11-20 at 12.  A portion of

4  Dominguez's law enforcement interview was played for the jury at trial. *See* ECF No. 11-25 at

5  49; ECF No. 13 at 23.  In that interview, Dominguez maintained that he "didn't see the knives,"

6  that "[s]omebody else killed [Friedman]," that he did not "know why [Friedman] ended up in the

7  hospital," that he did not "go to kill because it wasn't me," and that he went to Friedman's house

8  "[o]nly to collect," not to "kill this man." ECF No. 12-5 at 3, 18, 20, 39, 46.  The following

9  colloquy also took place between Dominguez and law enforcement:

10    A.    I'm telling you, I tell you that I gave him a blow.
      Q.    You gave a blow (unintelligible)
11    A.    A blow.
      Q.    To this guy. Where was he?
12    A.    Hector was high. Hector was high and (inaudible)
      Q.    How many did Hector have?
13    A.    Two.
      Q.    He said Hector had both knives.
14    A.    He, he didn't—he isn't, how do I tell you? He smokes a lot of drugs.
      Q.    Hector is –
15    A.    We gave blows and Hector and my brother said let's go because Hector was
            high.
16        . . .
      Q.    Why does your brother Damien say that you also have a knife?
17    A.    No, sir.
      Q.    Said no.
18    DB.   Ah, that's what he said. Why would he say that?
      Q.    That's what your brother.
19    A.    My brother is in front, sir. I didn't go. Anyway, I told you—
      Q.    His brother ____ (both talking) in front of him.
20    A.    I tell you that. It's true. My friend have the knife, you know. No.

21  *Id.* at 36, 44. Dominguez also stated:

22    Then me and my bro, and the girl, I have a scar and the girl said at my friend, I kill,
      I kill, and my brother say shut the fuck, go, ____ (unintelligible) my friend is
23    fuckin' crazy, go to the one street, whatever street and hide and the guy have the
      knife, I don't know where, where is this guy, so only for my mother, my bro only

1    one punch in the _____ (unintelligible) and my, and me only one punch. When my
2    bro _____ (unintelligible) in your head, in your face, the guy right there and me one
     punch because me had one problem. My, my hand is, is … I have this hand
3    deformed.

4  *Id.* at 50.

5        After the State rested, Dominguez's trial counsel "mo[ved] to dismiss th[e] case on the

6  basis of failure of the State to prove the prima facie case." ECF No. 13 at 48.  Dominguez's trial

7  counsel explained, in part, that "there is nothing to connect [Dominguez] with a deadly weapon

8  or a blunt instrument.  The fact that he was there is just a mere presence at this point." *Id.*  The

9  trial judge denied the motion. *Id.* at 51.

10        Because Dominguez's trial counsel challenged the sufficiency of the evidence at the end

11  of the State's case by moving to dismiss the charges, it is not readily apparent that he acted

12  deficiently in challenging Dominguez's "use" of a deadly weapon. *Strickland*, 466 U.S. at 688.

13  However, even if Dominguez's trial counsel acted deficiently—as he only argued that

14  Dominguez was not connected to the weapon, rather than arguing about Dominguez's

15  knowledge of the weapon—the Supreme Court of Nevada reasonably determined that

16  Dominguez failed to demonstrate prejudice. *Id.* at 694.

17        Nevada law provides that "any person who uses a firearm or other deadly weapon . . . in

18  the commission of a crime shall . . . be punished." Nev. Rev. Stat. § 193.165(1).  And as was

19  explained in connection with Ground 5, the Supreme Court of Nevada has "conclude[d] that an

20  unarmed offender 'uses' a deadly weapon . . . when the unarmed offender is liable as a principal

21  for the offense" or when "another principal to the offense is armed with and uses a deadly

22  weapon in the commission of the offense, and the unarmed offender had knowledge of the use of

23  a deadly weapon." *Brooks*, 124 Nev. at 210, 180 P.3d at 661.  Although Dominguez adamantly

denied stabbing Friedman during his law enforcement interview, the district court could have

found—based on Dominguez's various statements during that interview that Hector had

possession of a knife—that Dominguez had knowledge that a knife was taken to Friedman's

house to be used in the attack against him. *See id.*  Viewing this evidence "in the light most

favorable to the prosecution" (*Jackson*, 443 U.S. at 319), Dominguez fails to demonstrate that

that "there is a reasonable probability that" had his trial counsel further challenged the

sufficiency of the evidence regarding his "use" of the firearm, the trial judge would have

dismissed the charges against him or that the result of his trial would have been different.

*Strickland*, 466 U.S. at 694.  Indeed, this evidence demonstrates that a rational trier of fact could

have found beyond a reasonable doubt that Dominguez "used" a deadly weapon in the

commission of a crime. *Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319.

Because the Supreme Court of Nevada reasonably denied Dominguez's claim, I deny

federal habeas relief for Ground 6.

### 3.     Ground 7

In Ground 7, Dominguez argues that his trial counsel and appellate counsel failed to

challenge the sufficiency of the evidence regarding his participation in the attack, as the evidence

failed to demonstrate that he acted as a principal, an aider and abettor, or a co-conspirator. ECF

No. 31 at 30-31.  In its affirmation of the district court's denial of Dominguez's state habeas

petition, the Supreme Court of Nevada held:

> [A]ppellant claimed that trial counsel failed to object that there was insufficient
> evidence that he aided and abetted the crime.  Appellant failed to demonstrate that
> his trial counsel's performance was deficient or that he was prejudiced.  Appellant
> was found guilty of conspiracy to commit murder, conspiracy to commit a crime
> (burglary), and first-degree murder with the use of a deadly weapon.  Appellant's
> fingerprints were found in the laundry room where the victim was attacked.
> Appellant made inculpatory statements to the police.   Appellant failed to
> demonstrate that there was a reasonable probability of a different outcome had trial

counsel objected to the sufficiency of the evidence regarding his participation in the attack of the victim.  Therefore, we conclude that the district court did not err in denying this claim.

. . . [A]ppellant claimed that his appellate counsel was ineffective for failing to argue the underlying issues set forth above.  For the reasons discussed above, appellant failed to demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that any of the omitted issues would have had a reasonable probability of success on appeal. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). Therefore, we conclude that the district court did not err in denying this claim.

ECF No. 12-18 at 5.  This ruling was neither contrary to nor an unreasonable application of

clearly established law as determined by the Supreme Court of the United States.

After the State rested, Dominguez's trial counsel "mo[ved] to dismiss th[e] case on the

basis of failure of the State to prove the prima facie case." ECF No. 13 at 48.  In addition to

arguments regarding Dominguez's connection to the knife, as were discussed in Ground 6,

Dominguez's trial counsel also argued that "[t]he counts talk about conspiracy," but "[t]here's

been absolutely no evidence at all from either of the statements from the other co-defendants that

there was a conspiracy." *Id.*  Dominguez's trial counsel explained that "there's no evidence of

him actually touching or aiding and abetting the blows that sustain this terrible injury," and

"[t]here's no intention here to really commit a crime . . . [or] enter into a conspiracy." *Id.* at 50.

The state district court denied the motion, determining that "[i]t'll be up to the jury to determine

what, if any, reasonable inference can be drawn" from the evidence. *Id.* at 50-51.

Again, because Dominguez's trial counsel challenged the sufficiency of the evidence at

the end of the State's case by moving to dismiss the charges, it is not readily apparent that he

acted deficiently in challenging Dominguez's participation in the attack. *Strickland*, 466 U.S. at

688.  However, even if Dominguez's trial counsel, who was also his appellate counsel, acted

deficiently by not making further arguments in his oral motion or including this claim in

Dominguez's direct appeal, the Supreme Court of Nevada reasonably determined that Dominguez failed to demonstrate prejudice. *Id.* at 694.  As the Supreme Court of Nevada reasonably noted, Dominguez's fingerprints were found in Friedman's laundry room where the attack occurred, and Dominguez made inculpatory statements to law enforcement that he participated in the attack. *See* ECF No. 11-15 at 45; ECF No. 11-16 at 16-17; ECF No. 13 at 42. Viewing this evidence "in the light most favorable to the prosecution" (*Jackson*, 443 U.S. at 319), Dominguez fails to demonstrate that that "there is a reasonable probability that" had his trial counsel or appellate counsel further challenged the sufficiency of the evidence regarding his participation in the attack, the state district court would have dismissed the charges against him or that he would have prevailed on appeal. *Strickland*, 466 U.S. at 694; *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Rather, this evidence demonstrates that a rational trier of fact could have found beyond a reasonable doubt that Dominguez—either directly, through aiding and abetting, through a conspiracy, or pursuant to the felony murder rule—was a participant in the attack on Friedman. *Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319.

Because the Supreme Court of Nevada reasonably denied Dominguez's claim, I deny him federal habeas relief for Ground 7.

### 4.      Grounds 8 and 9

In Ground 8, Dominguez alleges that his trial counsel failed to allow him to testify on his own behalf and to hire and enlist the help of a forensic latent print expert, who could have evaluated the placement and condition of his fingerprints found in the laundry room to determine his direction and movement. ECF No. 31 at 32-33.  In Ground 9, Dominguez alleges that his trial counsel failed to call a forensic pathologist expert to challenge the cause and mechanism of Friedman's death. *Id.* at 33-34.

1    In its affirmation of the district court's denial of Dominguez's state habeas petition, the

2  Supreme Court of Nevada held:

3    [A]ppellant claimed that his trial counsel was ineffective for refusing to allow him
     to testify. Appellant failed to demonstrate that his trial counsel's performance was
4    deficient or that he was prejudiced. Appellant was personally canvassed and
     elected not to testify. Therefore, we conclude that the district court did not err in
5    denying this claim.

6    . . . [A]ppellant claimed that his trial counsel failed to hire a fingerprint expert to
     testify as to the direction and manner in which his fingerprints were left in the
7    laundry room and a forensic pathologist to testify regarding the cause of death—
     medical errors relating to the exploratory surgery. Appellant failed to demonstrate
8    that his trial counsel's performance was deficient or that he was prejudiced.
     Appellant failed to demonstrate that it was unreasonable not to call a fingerprint
9    expert in this case, and he further failed to demonstrate that any testimony regarding
     the direction or manner of the fingerprint would have had a reasonable probability
10   of altering the outcome at trial. This court has previously determined that appellant
     was a substantial factor in the victim's death. *Dominguez v. State*, Docket No.
11   55699 (Order of Affirmance, December 10, 2010). Appellant failed to demonstrate
     that further testimony regarding the victim's medical treatment, necessitated by the
12   attack on the victim, would have had a reasonable probability of altering the
     outcome at trial. *See Lay v. State*, 110 Nev. 1189, 1192-93, 886 P.2d 448, 450
13   (1994). Therefore, we conclude that the district court did not err in denying this
     claim.

14

15  ECF No. 12-18 at 6. These rulings were neither contrary to nor an unreasonable application of

16  clearly established law as determined by the Supreme Court of the United States.

17    I first address Dominguez's contention that his trial counsel failed to allow him to testify.

18  During Dominguez's trial, the trial judge canvassed him on his right to remain silent. *See* ECF

19  No. 13 at 45-47. Dominguez told the judge that his "attorney discussed with [him his] right to

20  remain silent." *Id.* at 45. Dominguez then indicated that he understood that he could not be

21  compelled to testify, that he could "waive and give up [his] right to remain silent," that a jury

22  instruction prohibiting the jury from drawing any inferences of guilt would be given if requested

23

1  if he chose not to testify, and that the State could question him about certain previous felonies.

2  *Id.* at 45-47.  Dominguez then stated that he "want[ed] to remain silent." *Id.* at 47.

3        "[A] defendant in a criminal case has the right to take the witness stand and to testify in

4  his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  The decision whether to

5  testify on his own behalf is one "the accused has the ultimate authority to make." *Jones v.*

6  *Barnes*, 463 U.S. 745, 751 (1983).  Here, the state district court properly canvassed Dominguez

7  about his right to testify. *See* ECF No. 13 at 45-47.  Beyond his statements in his petition that his

8  trial counsel refused to allow him to testify, Dominguez fails to present any evidence regarding

9  his trial counsel's actions in this regard.  Accordingly, the Supreme Court of Nevada reasonably

10 concluded that Dominguez failed to demonstrate that his trial counsel acted deficiently.

11 *Strickland*, 466 U.S. at 688.

12       I next address Dominguez's contentions that his trial counsel should have consulted with

13 forensic latent print and forensic pathologist experts.  As the Supreme Court of Nevada

14 reasonably concluded, Dominguez fails to demonstrate prejudice. *Strickland*, 466 U.S. at 694.

15 Dominguez fails to allege that either a forensic latent print expert or a forensic pathologist would

16 have testified on his behalf or would have been able to provide beneficial information to his

17 defense. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) ("Wildman offered no

18 evidence that an arson expert would have testified on his behalf at trial.  He merely speculates

19 that such an expert could be found.  Such speculation, however, is insufficient to establish

20 prejudice."); *see also Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about

21 what an expert could have said is not enough to establish prejudice.").

22       Because the Supreme Court of Nevada reasonably denied Dominguez's claims, I deny

23 him federal habeas relief for Grounds 8 and 9.

**D.       Grounds 11, 13, and 15**

The respondents previously asserted that Grounds 11, 13, and 15 were unexhausted. ECF No. 34 at 10-11.  I agreed. ECF No. 48 at 6-7.  After staying this action and allowing Dominguez to return to state court, the Nevada Court of Appeals ultimately held that Dominguez's second state habeas petition was untimely and successive. *See* ECF No. 88 at 1.  Thus, the respondents argued that Grounds 11, 13, and 15 were procedurally defaulted. *Id.*  Dominguez responded that any procedural default should be excused because he did not have counsel during his first state habeas petition, relying on *Martinez* 566 U.S. 1. *Id.* at 1-2.  I deferred resolution of this argument. *Id.* at 2.

In *Martinez*, the Supreme Court ruled that "when a State requires a prisoner to raise an ineffective-assistance-of-trial counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim" if "the state courts did not appoint counsel in the initial-review collateral proceeding" or "where appointed counsel in the initial-review collateral proceeding . . . was ineffective." 566 U.S. at 14.  "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

Dominguez was unrepresented throughout his initial state habeas action. *See* ECF Nos. 13-24, 12.  Therefore, the only issue is whether Dominguez's ineffective-assistance-of-trial-counsel claims are substantial.  Because Grounds 11, 13, and 15 were not adjudicated on their merits in state court, I review them de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

/ / / /

/ / / /

### 1. Ground 11

In Ground 11, Dominguez alleges that his trial counsel was ineffective for failing to adequately argue a motion to suppress evidence, to conduct a pretrial investigation of an alternative suspect, to limit the use of his co-defendants' confessions and statements to eliminate any references to him, and to object to his incriminating statements being admitted into evidence. ECF No. 31 at 37.  Dominguez fails to support these arguments with any factual allegations or evidence.  Dominguez fails to offer the identity of an alternative suspect or what evidence demonstrated that an alternative suspect existed.[3]  He fails to identify what specific statements should have been redacted from his co-defendants' statements or the basis for seeking such a redaction.  And he fails to identify what specific incriminating statements his trial counsel should have objected to or the basis for objecting.  This failure to support Ground 11 with specific allegations is fatal to the claim. *See, e.g., Jones v Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) ("Jones's conclusory allegations did not meet the specificity requirement.  The district court did not err in denying habeas relief on this ground.").  Further, Dominguez's first contention regarding the motion to suppress appears to be duplicative of Ground 15, and as such, will be discussed in Ground 15.  And Dominguez's third and fourth contentions regarding the redacting of his co-defendants' statements and objecting to his incriminating statements are not supported by Nevada law. *See* Nev. Rev. Stat. §51.035(3)(a), (e).  Because Dominguez's ineffective-assistance-of-trial-counsel argument fails, Ground 11 is not substantial and is denied because it is procedurally defaulted. *See Martinez*, 566 U.S. at 14.

---

[3] If Dominguez is referring to Hector as the alternative suspect, it is relevant to note that Dominguez stated during his law enforcement interview that he had not seen Hector since the attack, that he did not know how to contact Hector, and that Hector had disappeared. ECF No. 12-5 at 44.  It is unclear how Dominguez expected his trial counsel to have investigated Hector.

## 2.      Ground 13

In Ground 13, Dominguez alleges that his trial counsel failed to investigate the State's medical witnesses. ECF No. 31 at 42.  Dominguez contends that an investigation into these witnesses would have established that the stabbing did not cause Friedman's death. *Id.* at 43. Dominguez also alleges that his trial counsel should have obtained Friedman's medical records and consulted an expert, such as Dr. Bruce J. Hirschfeld, to review those records. *Id.*

In a July 15, 2013 letter, Dr. Hirschfeld noted that he reviewed Friedman's autopsy report and Dr. Telgenhoff's testimony from Dominguez's brother's trial.[4] ECF No. 32 at 83.  Dr. Hirschfeld noted that "[i]t [was] apparent to [him] that Dr. Telgenhoff [did] not have a surgical background, nor the clinical acumen to causally associate surgical complications with morbidity and/or morality." *Id.* at 84.  Dr. Hirschfeld also "question[ed] whether Mr. Friedman had a seizure, resulting in his aspiration pneumonia, and in fact, did not die from complications of a surgery that may or may not have been necessitated by his presentation following his assault, with multiple stab wounds." *Id.* at 84-85.  Dr. Hirschfeld concluded that "the autopsy findings in [sic] Mr. Friedman and trial testimony of Dr. Telgenhoff provide a picture of an incomplete and inadequate clinical evaluation of the cause and effect of multiple stab wounds sustained by Mr. Friedman in his untimely death." *Id.* at 85.

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

---

[4] Dr. Hirschfeld's July 15, 2013 letter was originally prepared for Dominguez's brother's case, *Dominguez v. Williams*, 2:12-cv-01608-JAD-DJA. *See* ECF No. 31 at 40, n.8.

1   judgments." *Id.*  This investigatory duty includes investigating the defendant's "most important

2   defense" (*Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994)), and investigating and

3   introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt

4   about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

5   "[I]neffective assistance claims based on a duty to investigate must be considered in light of the

6   strength of the government's case." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir.

7   1986).

8           The State listed numerous expert medical witnesses: Dr. Piotr Kubiczek,

9   Paramedics/AMR Unit 3911, Dr. David McElmeel, Dr. Patrick Murphy, Dr. Sernariano, Dr.

10  Deborah Kuls, Dr. Casey Michael, Dr. Laura Boomer, Dr. Shaw Tang, and Dr. Stephanie

11  Woodard. ECF No. 11.  It is unclear from the record what, if any, investigation was conducted

12  by Dominguez's trial counsel into these possible witnesses.  However, as was discussed above,

13  the cause of Friedman's death was a significant issue at trial.  Accordingly, to the extent that

14  Dominguez's trial counsel failed "to make reasonable investigations" into the cause of

15  Friedman's death, counsel was deficient. *Strickland*, 466 U.S. at 688, 691.

16          But even if Dominguez's trial counsel was deficient, Dominguez fails to demonstrate

17  prejudice. *Id.* at 694.  First, he fails to demonstrate that an investigation into any of the State's

18  witnesses would have led to favorable evidence. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir.

19  2019) ("*Strickland* prejudice is not established by mere speculation.").  Second, even if trial

20  counsel had presented the testimony of an expert such as Dr. Hirschfeld, that testimony would

21  only have presented a question of fact as to Friedman's cause of death for the jury to resolve

22  after also considering Dr. Telgenhoff's testimony.  And Dr. Hirschfeld did not conclude that

23  Friedman's surgery was unnecessary, instead explaining that it "may or may not have been

necess[ary]." ECF No. 32 at 84-85.  Dominguez fails to demonstrate that testimony such as this would have changed the outcome of his trial because the jury was instructed that "[a] person is liable for the killing of another person even if the death of the victim was the result of medical treatment, so long as the wound inflicted upon the victim was the reason which necessitated the treatment." ECF No. 13-2 at 31.

Because Dominguez has not shown a reasonable probability that, but for counsel's failure to investigate the State's witnesses, the result of his trial would have been different (*Strickland*, 466 U.S. at 694), Ground 13 is not substantial.  Therefore, there is no cause to excuse Dominguez's procedural default. *Martinez*, 566 U.S. at 9.  I deny Ground 13 because it is procedurally defaulted.

### 3.    Ground 15

In Ground 15, Dominguez alleges that his trial counsel failed to move to suppress his confession to law enforcement. ECF No. 31 at 49-50.  Dominguez elaborates that even though he was given *Miranda*[5] warnings at the beginning of his interaction with law enforcement, law enforcement was required to re-inform or remind him of those rights as soon as the interaction changed to a custodial interrogation, which happened when the detective was informed that Dominguez's fingerprints matched those found at Friedman's residence. *Id.* at 50.[6]

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Dominguez also asserts that his trial counsel failed to move to suppress his confession on the basis that law enforcement repeatedly lied to him during the interview. ECF No. 31 at 50. This argument lacks merit.  Dominguez's trial counsel argued that Dominguez's confession was involuntary because "there's going to be some untruths said by the officers to what evidence they have, and it's a little - - some white lies in there as to what the state of the evidence against him is." ECF No. 13 at 19-20.  As such, Dominguez fails to demonstrate that his trial counsel acted deficiently. *Strickland*, 466 U.S. at 688.  And even if Dominguez's trial counsel was deficient, Dominguez has not shown prejudice because he fails to demonstrate that the state district court would have granted such a motion. *Id.* at 694; *see also Sheriff v. Bessey*, 112 Nev. 322, 325, 914

1    Detective Boucher testified that the law allowed him "60 minutes to detain someone on

2  an investigatory stop, so" his plan was to "keep [Dominguez] there [in the airport]" for 60

3  minutes while waiting for his fingerprint results. ECF No. 11-25 at 39.  After Dominguez went

4  through security at the airport, Detective Boucher and several other law enforcement officers

5  "had him come back with [them] to an office." *Id.* at 41.  This office was "a small room . . .

6  behind the secure doors of the airport." *Id.* Dominguez was shown the search warrant allowing

7  the collection of his latent fingerprints, and his fingerprints were collected. *Id.* at 41-42.

8  Dominguez was then informed of his *Miranda* rights and was told that he was not under arrest

9  and was simply being interviewed; Dominguez agreed to speak with Detective Boucher. *Id.* at

10  45; *see also* ECF No. 12-4 at 34-37.  During the interview, Detective Boucher received a

11  telephone call informing him that Dominguez's fingerprints matched the prints found at

12  Friedman's residence. ECF No. 13 at 26.  After this information was conveyed to Dominguez

13  (*see* ECF No. 12-5 at 15-16), he acknowledged that he entered Friedman's residence and that he

14  "punched [Friedman] one time." ECF No. 13 at 26-27, 42.  At the end of the interview,

15  Dominguez was arrested. ECF No. 12-6 at 10.

16    "[T]he prosecution may not use statements, whether exculpatory or inculpatory,

17  stemming from custodial interrogation of the defendant unless it demonstrates the use of

18  procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v.*

19  *Arizona*, 384 U.S. 436, 444 (1966).  Custodial interrogation "mean[s] questioning initiated by

20  law enforcement officers after a person has been taken into custody or otherwise deprived of his

21  freedom of action in any significant way." *Id.*  And "the term 'interrogation' under *Miranda*

22  _____

23  P.2d 618, 619 (1996) ("[A]n officer's lie about the strength of the evidence against the defendant
   is, in itself, insufficient to make the confession involuntary.").

refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

"[T]he ultimate inquiry" of whether someone is in custody "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); *cf. Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("The . . . noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*."). There are "[t]wo discrete inquiries" to determine whether an individual is in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Relevant factors in ascertaining how an individual would assess his freedom of movement "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted). The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

Dominguez fails to explain how the introduction of the fingerprint match during the middle of his law enforcement interview transformed the interview into a custodial interrogation.

1   The location of the questioning, the types of questions being asked, and the absence of physical

2   restraints remained constant even after this information was relayed.  Rather, contrary to

3   Detective Boucher's trial testimony that he was simply conducting an investigatory stop of

4   Dominguez, it appears that the meeting with Dominguez at the airport was a custodial

5   interrogation from the beginning.  Dominguez was confronted by Detective Boucher and several

6   other law enforcement officers, taken to a secure room at the airport, and asked pointed questions

7   about his involvement in the attack on Friedman. *See Thompson*, 516 U.S. at 112; *Howes*, 565

8   U.S. at 509.  Because Dominguez was given *Miranda* warnings prior to any questioning by

9   Detective Boucher, there was no basis upon which his trial counsel should have moved to

10  suppress his confession based upon the lack of a proper, timely *Miranda* warning. *Miranda*, 384

11  U.S. at 444.  Because Dominguez's trial counsel was not deficient in this regard (*Strickland*, 466

12  U.S. at 688), Ground 15 is not substantial.  Therefore, there is no cause to excuse Dominguez's

13  procedural default. *Martinez*, 566 U.S. at 9.  I deny Ground 13 because it is procedurally

14  defaulted.

15      **E.      Ground 10**

16          In Ground 10, Dominguez alleges that he is entitled to relief based on cumulative errors.

17  ECF No. 31 at 34-35.  He bases this claim "upon the cumulative trial and attorney errors

18  presented throughout [his federal habeas] petition." *Id.* at 34.  The respondents previously

19  asserted that Ground 10 was unexhausted. ECF No. 34 at 11.  The respondents explained that

20  Dominguez presented this claim in his first state habeas petition, but that petition did not contain

21  all the grounds asserted in his amended federal petition, which Dominguez now seeks to also

22  include in his argument on cumulative error. ECF No. 34 at 12.  I agreed, determining that

23  Ground 10 was unexhausted in part. ECF No. 48 at 8.  After staying this action and allowing

Dominguez to return to state court, the Nevada Court of Appeals ultimately held that his second state habeas petition was untimely and successive. *See* ECF No. 88 at 1. Thus, the respondents argued that Ground 10 was procedurally barred. ECF No. 74 at 6. Dominguez responded that any procedural default should be excused because he did not have counsel during his first state habeas petition, relying on *Martinez*, 566 U.S. 1. ECF No. 88 at 1-2. I deferred resolution of this issue. *Id.* at 2.

The respondents now argue that Ground 10 is procedurally barred and Dominguez cannot establish good cause to overcome the default. ECF No. 91 at 13. I agree. "A claim has not been fairly presented in state court if new factual allegations either 'fundamentally alter the legal claim already considered by the state courts,' or 'place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'" *Dickens*, 740 F.3d at 1318 (internal citation omitted). Because remaining Grounds 1, 11, 13, and 15 of Dominguez's amended federal petition were not a part of Dominguez's cumulative error claim in his appeal of the denial of his state habeas petition before the Supreme Court of Nevada, these grounds are "new factual allegations" that fundamentally alter Ground 10 into a new claim as compared to its presentation in Dominguez's first state habeas action. Therefore, Ground 10 is barred by the procedural default doctrine unless Dominguez can overcome the procedural default. *Martinez* applies only to claims of ineffective assistance of trial counsel. Ground 10 is not an ineffective-assistance-of-counsel claim. Thus, Dominguez cannot overcome the procedural default, and Ground 10 is dismissed.[7]

---

[7] Dominguez requests that I "[c]onduct a hearing at which proof may be offered concerning the allegations in this amended petition and any defense that may be raised by respondents." ECF No. 31 at 54. I have already determined that Dominguez is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an

**IV.     CERTIFICATE OF APPEALABILITY**

This is a final order adverse to Dominguez.  Rule 11 of the Rules Governing Section 2254 Cases requires me to issue or deny a certificate of appealability (COA).  I have *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).  A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*  Applying these standards here, a certificate of appealability is unwarranted.

**V.     CONCLUSION**

I THEREFORE ORDER that the First Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 **(ECF No. 31) is DENIED**.

I FURTHER ORDER that petitioner Ivan Dominguez is denied a certificate of appealability.

I FURTHER ORDER the Clerk of the Court enter judgment accordingly.

Dated: July 29, 2020.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

---

evidentiary hearing would affect my reasons for denying Dominguez's remaining grounds for relief.  I thus deny Dominguez's request for an evidentiary hearing.